**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JULIE WERKHEISER,**

                                      **Plaintiff,**

      **vs.**                                        **3:24-CV-1415**
                                                  **(MAD/TWD)**

**VILLAGE OF WAVERLY, et al.,**

                                        **Defendants.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **HALE & MONICO LLC** | **ARTHUR LARKIN, ESQ.** |
| 250 Park Avenue – 7th Floor | |
| New York, New York 10177 | |
| Attorneys for Plaintiff | |
| | |
| **MURPHY BURNS GROUDINE LLP** | **STEPHEN M. GROUDINE, ESQ.** |
| 407 Albany Shaker Road | |
| Loudonville, New York 12211 | |
| Attorneys for Defendants Village of Waverly | |
| and Police Officer Chad Sackett | |
| | |
| **GOLDBERG SEGALLA, LLP** | **JONATHAN M. BERNSTEIN, ESQ.** |
| 8 Southwoods Boulevard, Suite 300 | |
| Albany, New York 12211-2526 | |
| Attorneys for Defendants County of Tioga | |
| and Cheryl Mancini | |

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.  INTRODUCTION**

On November 20, 2024, Plaintiff Julie Werkheiser ("Plaintiff") commenced this action, bringing claims for constitutional violations, pursuant to 42 U.S.C. § 1983 ("§ 1983") and state law, against Defendants Village of Waverly ("the Village") and Police Officer Chad Sackett

("Defendant Sackett," collectively with the Village, "the Village Defendants"), County of Tioga ("the County") and Cheryl Mancini ("Defendant ADA Mancini," collectively with the County, "the County Defendants"), and ten John Doe law enforcement officials. *See* Dkt. No. 1. Plaintiff alleges she was falsely charged with and wrongfully prosecuted for two counts of predatory sexual assault against a child. *See id.* at ¶ 1. Specifically, Plaintiff brings claims pursuant to state law for malicious prosecution and failure to intervene, as well as pursuant to § 1983 for malicious prosecution, denial of the right to a fair trial, failure to intervene, and failure to train. *See id.* at ¶¶ 212-57.

Currently before the Court are two motions to dismiss, filed by the Village Defendants and County Defendants, respectively. *See* Dkt. Nos. 17, 20. Plaintiff opposes both motions. *See* Dkt Nos. 25, 29. For the reasons set forth below, the Village Defendants' and County Defendants' motions to dismiss are granted in part and denied in part.

## II. BACKGROUND

Unless otherwise noted, the facts recited herein are drawn from the complaint and assumed true for the purposes of the present motions. In or around 2014, Plaintiff was accused of sexual abuse by two teenage girls, sisters Scarlett and Stella Stone, who are now both over the age of eighteen. *See* Dkt. No. 1 at ¶ 23. The two sisters are the biological daughters of Plaintiff's wife, Samatha Werkheiser (formerly Samatha Stone) and Samantha's ex-husband Jason Haase (formerly Jason Stone). *See id.* at ¶¶ 26-27. Scarlett and Stella both suffer from phenylketonuria ("PKU"), "a genetic birth defect that can cause brain damage and requires a strict low-protein diet." *Id.* at ¶ 45.

The backdrop of the underlying action is an embittered divorce between Samantha Werkheiser and Jason Haase, Scarlett and Stella's parents. *See id.* at ¶¶ 35-53. Around 2000,

Plaintiff and Samantha began an affair, while Samantha was still married to Jason. *See id.* at ¶ 37. After he discovered the affair, Jason became "enraged and vindictive." *Id.* at ¶ 38. Following felony convictions for sexually assaulting Samantha in front of Scarlett and Stella, Jason lost custody of the sisters. *See id.* at ¶¶ 39-43. From 2000 through November 2007, Samatha had custody of Scarlett and Stella, and the girls lived with Plaintiff and Samantha near Binghamton, New York, in Broome County. *See id.* at ¶¶ 27-28, 44.

From 2003 to 2007, the sisters took dance lessons at "Studio J," located in Waverly, New York, in Tioga County. *See id.* at ¶¶ 24-26. Plaintiff owned Studio J and she and Samantha taught dance lessons to school aged-children there. *See id.*

In November 2007, Samantha lost custody of Scarlett and Stella for medical neglect, and the girls began to live with Jason and his new wife Kristianna ("Kristy") Haase, near Syracuse, New York. *See id.* at ¶¶ 46-47. After Jason took custody of the girls, they no longer attended Studio J and had "virtually no contact" with Plaintiff. *Id.* at ¶ 48. Nearly four years later, Samantha filed a Family Court petition for expanded visitation and/or joint custody—a few months thereafter, the sisters accused their mother of sexually abusing them during the time they lived with her in Binghamton. *See id.* at ¶¶ 49-50. Plaintiff claims that these allegations were the result of Jason's manipulation and parental alienation, fueled by Jason's pursuit of revenge for the tumultuous divorce and his criminal convictions for sexually assaulting Samantha. *See id.* at ¶¶ 51-52. The sisters' PKU, which affected their memory, made them suggestible and susceptible to Jason's manipulation. *See id.* at ¶ 53.

Although Scarlett and Stella accused their mother Samantha of sexual abuse in 2011, at that time "they specifically stated that [Plaintiff] did not do anything to them," and made no allegations that they were abused at Studio J in Tioga County. *Id.* at ¶¶ 54-55. A trial was

conducted in May 2013, where Stella testified that Plaintiff participated in Samantha's abuse at the home in Binghamton, but did not testify that any abuse occurred at Studio J. *See id.* at ¶¶ 56-57. Samantha was acquitted of abusing Stella but convicted of abusing Scarlett. *See id.* at ¶ 56. However, after two trials and two appeals, the charges against Samantha were eventually dismissed. *See id.* at ¶ 58.

In August 2013, after Samantha's initial trial, Kristy Haase, the girl's stepmother, filed a report with the Onondaga County Department of Social Services ("DSS"), to report allegations similar to those Stella testified about: that Plaintiff had sexually abused Stella years earlier at the home in Binghamton when the sisters lived there. *See id.* at ¶¶ 59-60. At this time, neither Stella nor Kristy had alleged that any abuse happened at Studio J in Waverly, nor that Plaintiff had ever abused Scarlett. *See id.* at ¶¶ 59-61. DSS opened an investigation and contacted the Broome County District Attorney's Office. *See id.* at ¶¶ 62-63. Assistant District Attorney Veronica Krause ("ADA Krause"), who handled Samantha's prosecution, advised DSS that "(i) the Broome County authorities would not take action on Kristy's report, and (ii) a jury had recently acquitted Samantha on charges that she abused Stella, because the jury did not find Stella to be credible." *Id.* at ¶¶ 64-65. Dr. Wendy Gordon, a therapist that had worked with the family for years, also told DSS that, in her opinion, Kristy's complaint " was made 'not for the best interest of the girls but to get [Plaintiff] in trouble.'" *Id.* at ¶ 67.

On September 27, 2013, DSS conducted an interview of Stella at Andrus Children's Facility, where Stella lived at the time. *See id.* at ¶ 71. During the interview, Stella told DSS that Plaintiff had abused her at their home in Binghamton. *See id.* at ¶ 72. This story contradicted Stella's August 2011 videotaped interview where she stated that Plaintiff did not abuse her. *See id.* Stella further claimed that she saw Samantha abuse other dance students, A.K. and B.N., at

Studio J, but that "'she didn't have any knowledge of [Plaintiff] abusing anyone at the dance studio.'" *Id.* at ¶¶ 73-76.

A few days later DSS interviewed Scarlett at the Broome County Children's Advocacy Center. *See id.* at ¶ 77. Scarlett claimed that Samantha had abused other unnamed students at Studio J, but denied that she ever witnessed Plaintiff abuse anyone or that Stella had told her that she had been abused by Plaintiff. *See id.* at ¶¶ 78-80. During the September interview with DSS, Scarlett did not allege that Plaintiff abused her or anyone else at Studio J. *See id.* at ¶ 82.

Solely based on Stella's claim that Plaintiff abused her in Binghamton, DSS found that the claim of abuse was "indicated" on October 29, 2013. *See id.* at ¶ 83. When Jason and Kristy Haase were told that Broome County did not intend to act on Kristy's report, they were both angry. *See id.* at ¶ 68. From October 2013 through January 2014, Kristy "repeatedly demanded" that ADA Krause act based on the DSS "indicated" report. *Id.* at ¶ 84. However, the Broome County District Attorney's office "adhered to its decision not to bring charges against [Plaintiff]." *Id.* at ¶ 85.

In January 2014, Kristy Haase spoke with law enforcement officials in Tioga County, who told her that according to the information they had, "'no crime was committed' in that county." *Id.* at ¶ 86. Two months later, on March 10, 2014, Scarlett alleged for the first time that Plaintiff had sexually abused her at Studio J in Tioga County. *See id.* at ¶¶ 93-94. Scarlett made this report to a paralegal at the County Attorney's Office, who was handling Family Court proceedings related to Samantha and Plaintiff's son Julius. *See id.* This new allegation contradicted Scarlett's prior statements to the Binghamton police in August 2011, where she stated that Plaintiff never abused her, and with her prior interview with DSS. *See id.* at ¶ 95.

On March 12, 2014, Kristy Haase called the New York State Police to report that Plaintiff

had abused Scarlett at Studio J.  *See id.* at ¶ 98.  A New York State Police investigator interviewed Scarlett on March 13, 2014, and Scarlett signed a sworn deposition attesting to, among other things, her allegations that Plaintiff abused her inside a closet at Studio J, and added, for the first time, that Plaintiff abused both Stella and Scarlett inside the bathroom/storage area at the studio, forcing them to watch the other be abused.  *See id.* at ¶¶ 102-04.  New York State Police investigators noted in their reports that Scarlett's statements were materially different than those she previously made.  *See id.* at ¶¶ 105-06.

Defendant Sackett was assigned the investigation, after the New York State Police turned the investigation over to the Waverly Police Department on March 31, 2014.  *See id.* at ¶¶ 107-08.  At this point, the Waverly Police and the Tioga County District Attorney's Office, which had jurisdiction, began to handle the investigation.  *See id.* at ¶ 109.  Defendant Sackett asked the New York State Police to interview Stella and forwarded to them, among other things, the DSS report and Scarlett's sworn statement.  *See id.* at ¶¶ 110-11.  At the request of the New York State Police, the Westchester County District Attorney's Office conducted a forensic interview of Stella on April 16, 2024.  *See id.* at ¶¶ 112-15.  During this interview Stella alleged, for the first time, that Plaintiff abused her at Studio J, echoing Scarlett's claims made one month prior.  *See id.* at ¶ 116.  Stella acknowledged that she and Scarlett had discussed the alleged abuse since the time Stella had been living an Andrus Children's Facility, but, in contrast to Scarlett's sworn statement, Stella claimed that she never saw Plaintiff abuse Scarlett.  *See id.* at ¶¶ 119-20.

After Defendant Sackett obtained the recordings of Stella's April 16, 2014, interview, he reported, despite the noted inconsistencies, that "he 'did find the testimony of [Stella] Stone to corroborate the written statement of her sister, Scarlett Stone.'"  *Id.* at ¶¶ 124-28.  Plaintiff alleges that the investigatory interviews departed from accepted practices because the interviewer

6

(i) failed to ask Stella any questions or obtain any details about any
specific incident of abuse; (ii) did not ask Stella about the obvious
contradiction between her statement and Scarlett's, or ask whether
[Plaintiff] ever abused her and Scarlett together as Scarlett had
claimed; (iii) failed to explore with Stella any alternative
hypotheses for why she and her sister had made wildly inconsistent
claims about abuse, or why the girls never disclosed the alleged
abuse despite many opportunities to do so in the past; (iv) failed to
consult with any other professionals, including mental health or
PKU experts, prior to, or in conjunction with, the interview; and (v)
inappropriately told Stella she was "proud" of her for coming
forward and that it took "a lot of courage" for her to do so.

*Id.* at ¶ 129.

After speaking with "Investigator Woody" in the Binghamton Police Department and

learning that the Binghamton District Attorney would likely not pursue charges, Defendant

Sackett conducted a walkthrough of Studio J and took photographs.  *See id.* at ¶¶ 131-33.

Defendant Sackett then forwarded the case file to Defendant ADA Mancini.  *See id.* at ¶ 136.

Defendant Sackett did not speak with Scarlett, nor did he take further investigative steps.  *See id.*

at ¶ 134.  Despite the purported flaws in the investigation up to this point, Defendants Sackett and

ADA Mancini did not conduct a second forensic interview of Stella.  *See id.* at ¶ 130.

Plaintiff claims that Defendant Sackett departed from accepted practices because he failed

to

(i) recommend (or conduct) a forensic, recorded interview with
Scarlett; (ii) explore with [Scarlett], or with Stella, the substantial,
material inconsistencies between her sworn deposition and Stella's
recorded interview; (iii) follow up on [Investigator] Woody's
statement that the Broome County District Attorney "will not
touch" the case, and the reasons why law enforcement officers in
Broome County would not prosecute [Plaintiff]; (iv) investigate any
possible reasons why the girls had never disclosed [Plaintiff's]
alleged abuse despite multiple opportunities in the past to disclose
it; (v) review any case materials regarding the girls' father Jason's
criminal sexual assault of their mother, or the question whether the
girls' delayed, contradictory allegations were the result of parental

> alienation; (vi) interview the girl whom Scarlett claimed [Plaintiff] abused at the studio, B.S., or the other girls Stella claimed that her mother had abused at the studio, even though these allegations could have been easily disproven had [Defendant] Sackett taken this basic step; (vii) interview any other neutral third parties, including parents who knew the girls when they took dance lessons, in order to assess the credibility of their allegations; (viii) consult other appropriate experts, including a child psychiatrist or psychologist, or an expert in PKU, to assist in the investigation; or (ix) request another forensic interview of Stella given the obvious shortcomings in the interview conducted by Westchester County ADA Jamie Fair.

*Id.* at ¶ 135.

After receiving the case file, Defendant ADA Mancini "continued the investigation by meeting with Scarlett and Kristy Haase." *See id* at ¶¶ 139-40. This interview was unrecorded and was conducted before Plaintiff was arrested or indicted. *See id.* at ¶¶ 143-44. Similar to Defendant Sackett, Plaintiff claims that Defendant ADA Mancini failed to

> (i) recommend (or conduct) a forensic, recorded interview with Scarlett; (ii) explore with her, or with Stella, the substantial, material inconsistencies between her sworn deposition and Stella's recorded interview; (iii) obtain a satisfactory explanation from ADA Krause as to why Broome County declined to prosecute [Plaintiff], even though she spoke to ADA Krause multiple times; (iv) review any case materials regarding the girls' father Jason's criminal sexual assault of their mother, or the question whether the girls' delayed, contradictory allegations were the result of parental alienation; (v) interview any of the girls whom Scarlett alleged that [Plaintiff] abused at the studio, including B.S., B.N. or B.P., or the girls whom Stella claimed that her mother had abused at the studio, even though these allegations could have been easily disproven had she taken this basic step; (vi) interview any other neutral third parties, including parents who knew the girls when they took dance lessons, in order to assess the credibility of their allegations; (vii) consult other appropriate experts, including a child psychiatrist or psychologist, or an expert in PKU, to assist in the investigation; or (viii) request another forensic interview of Stella given the obvious shortcomings in the interview conducted by Westchester County ADA Jamie Fair.

*Id.* at ¶ 157.

Sometime thereafter, the Tioga County District Attorney's Office presented the case to the grand jury. *See id.* at ¶ 159. Defendant ADA Mancini presented testimony by Scarlett and Stella, regarding the alleged abuse in Tioga County, "even though she knew the testimony was false and even though she had participated in creating that false testimony during the investigation." *Id.* at ¶ 163. In November 2014, the grand jury returned an indictment charging Plaintiff with four felonies and Defendant Sackett arrested Plaintiff. *See id.* at ¶¶ 168-70. In November 2015, Plaintiff went to trial on two counts and was convicted by a jury. *See id.* at ¶ 186.

On appeal, the New York State Supreme Court Appellate Division, Third Department affirmed Plaintiff's conviction. *See id.* at ¶¶ 190-93. However, after Stella recanted her accusations to five witnesses, the New York State courts granted Plaintiff's motion for a new trial and, eventually, all charges against Plaintiff were dismissed, as of January 26, 2024. *See id.* at ¶¶ 194-211. In total, Plaintiff spent nearly eight years incarcerated. *See id.* at ¶ 219.

In their present motion the Village Defendants argue that (1) the [§] 1983 malicious prosecution and fair trial claims must be dismissed against the Village Defendants to the extent that they are based on mere negligence; (2) the malicious prosecution claim against the Village Defendants must be dismissed as there was probable cause for the prosecution; (3) the malicious prosecution claim against the Village Defendants must be dismissed as Defendant Sackett did not initiate and continue the legal proceedings; (4) the denial of a fair trial claim must be dismissed as it was not pled with sufficient specificity; (5) the failure to intervene claim must be dismissed because there was no underlying constitutional violation; and (6) the Village cannot be held liable pursuant to *Monell* as Plaintiff failed to allege an underlying constitutional claim and has not alleged a pattern of failure to train causing similar constitutional injuries. *See* Dkt. No. 17-1.

The County Defendants, in their motion, argue that (1) the claims against Defendant ADA

Mancini must be dismissed based on absolute immunity, or, at a minimum because she is entitled

to qualified immunity; (2) the malicious prosecution claim against the County Defendants must be

dismissed as there was probable cause for the prosecution; (3) the County cannot be held liable

pursuant to *Monell* for failure to train its prosecutors as the complaint does not sufficiently allege

a pattern of constitutional violations and because Plaintiff failed to allege an underlying

constitutional claim; (4) the denial of a fair trial claim must be dismissed because it was not pled

with specificity and, particularly, because Plaintiff has not alleged that Defendant ADA Mancini

fabricated evidence; (5) Plaintiff cannot seek damages for wrongful incarceration from 2015 to

2023 because such a claim in time-barred; and (6) Plaintiff cannot seek punitive damages against

the County Defendants.  *See* Dkt. No. 20-1.

### III. DISCUSSION

**A.    Standard of Review**

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief.  *See Patane v.

Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted).  In considering the legal

sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all

reasonable inferences in the pleader's favor.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493

F.3d 87, 98 (2d Cir. 2007) (citation omitted).  This presumption of truth, however, does not

extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although a court's

review of a motion to dismiss is generally limited to the facts presented in the pleading, the court

may consider documents that are "integral" to that pleading, even if they are neither physically

attached to, nor incorporated by reference into, the pleading.  *Mangiafico v. Blumenthal*, 471 F.3d

391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir.

2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face." *Id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.* at 570.

**B.    Extrinsic Documents**

Along with her memoranda of law in opposition to Defendants' motions, Plaintiff has filed several extrinsic documents, attached as exhibits to declarations filed be her counsel. *See* Dkt. Nos. 26, 28. The Village Defendants argue that these documents cannot be considered by the Court on the present motions because such evidence was not included in Plaintiff's complaint. *See* Dkt. No. 31 at 4-6. The County Defendants join this argument. *See* Dkt. No. 34 at 5.

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself" unless all parties are given a reasonable opportunity to submit extrinsic evidence. *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). "In ruling on a

motion to dismiss pursuant to Rule 12(b)(6), a district court generally must confine itself to the four corners of the complaint and look only to the allegations contained therein." *Robinson v. Town of Kent*, No. 11-CV-875, 2012 WL 3024766, *4 (S.D.N.Y. July 24, 2012) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)). However, in considering a motion to dismiss, "the Court may consider documents attached as an exhibit thereto or incorporated by reference, documents that are 'integral' to plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (internal citations omitted). To incorporate a document by reference, "the [c]omplaint must make a clear, definite and substantial reference to the document[ ]." *Id.* at 275 (citations omitted).

"Rule 12(b) gives district courts two options when matters outside the pleadings are presented in response to a 12(b)(6) motion: the court may exclude the additional material and decide the motion on the complaint alone or it may convert the motion to one for summary judgment under Fed .R. Civ .P. 56 and afford all parties the opportunity to present supporting material." *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) (citations omitted). Thus, while a court must convert a motion to dismiss for failure to state a claim into a motion for summary judgment if matters outside the pleadings are presented to and not excluded by the court, Fed. R. Civ. P. 12(d) conversion is not required if the court disregards the extrinsic material. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) (finding matters outside the pleadings presented to the court were "excluded" within the meaning of Rule 12(d) by the district court's explicit refusal to consider the outside materials).

### 1. Defendant Sackett's Report

Exhibit 1 to the declaration in support of Plaintiff's opposition to the Village Defendants'

motion is a police report prepared by Defendant Sackett, related to the underlying events.  *See*

Dkt. No. 26 at 5-12.  The Court finds that the complaint incorporates this document by reference

because the complaint makes clear, definite, and substantial references thereto.  *See* Dkt. No. 1 at

¶¶ 126-28 (quoting the report directly and alleging that statements therein were "materially

false").

### 2. Training Related Documents

Exhibits 3, 4, and 5 to the declaration in support of Plaintiff's opposition to the County

Defendants' motion and Exhibits 2, 3, 4, and 5 to the declaration in support of Plaintiff's

opposition to the Village Defendants' motion appear to be training materials from academic

publications, local police agency seminars, and publications from the United States Department of

Justice.  None of these documents were attached to the complaint, incorporated by reference, or

even mentioned therein.  *See, generally*, Dkt. No. 1.

Additionally, "[t]o be integral to a complaint, the plaintiff must have (1) actual notice of

the extraneous information and (2) relied upon th[e] documents in framing the complaint."

*DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (quotations and internal

quotation marks omitted).  "Mere notice or possession is not enough for a court to treat an

extraneous document as integral to a complaint; the complaint must rely heavily upon the

document's terms and effect for that document to be integral." *Id.* (quoting *Chambers v. Time*

*Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (cleaned up)).  "Even if a document meets the

twin requirements of integrality—reliance and notice—a court still may not consider it on a

motion to dismiss if there is a dispute 'regarding the authenticity or accuracy of the document' or

'the relevance of the document' to the dispute." *Id.* (quoting *Faulkner*, 463 F.3d at 134).  Plaintiff

has not demonstrated that these documents were "integral" to her complaint and, thus, the Court

refuses to consider them.

### 3. State Court Transcripts

Plaintiff also submits part of a transcript from her criminal trial in State of New York County Court, Tioga County. *See* Dkt. No. 26 at 64-66.  The Court takes judicial notice of this transcript. *See Rich v. New York*, No. 21-CV-835, 2022 WL 992885, *2 n.2 (S.D.N.Y. Mar. 31, 2022) ("The Court may take judicial notice of these transcripts as a matter of public record") (citing S*hmueli v. City of New York*, 424 F.3d 231, 233 (2d Cir. 2005)).

### 4. State Court Orders and Legislative Documents

The balance of Plaintiff's extrinsic documents consist of a state court order and legislative materials.  On a Rule 12(b)(6) motion, the Court may take judicial notice of a state court decision or statute. *See Chambers*, 282 F.3d at 152-53; *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6), including case law and statutes") (citations omitted).  Thus, the Court takes judicial notice of these documents.[1]

## C.    Absolute and Qualified Immunity

The County Defendants argue that Defendant ADA Mancini has absolute immunity for those actions alleged in the complaint or, at a minimum, is entitled to qualified immunity. *See* Dkt. No. 20-1 at 19-23.  Plaintiff contends that Defendant ADA Mancini is not entitled to absolute immunity because she acted in an investigative function. *See* Dkt. No. 29 at 21-24.

---

[1]  In sum, the Court declines to Court convert the instant motions into ones for summary judgment as Plaintiff has not requested as much and discovery has not yet commenced.  Moreover, although some documents have been considered, none of these documents (either those considered or not considered) alter the Court's decision with respect to the pending motions, for the reasons set forth herein. *See DeLuca*, 695 F. Supp. 2d at 61 ("'Nevertheless, as this Opinion will show,

### 1. Absolute Immunity

"The doctrine of absolute immunity applies broadly to shield a prosecutor from liability for money damages (but not injunctive relief) in a § 1983 lawsuit, even when the result may be that a wronged plaintiff is left without an immediate remedy." *Anilao v. Spota*, 27 F.4th 855, 863-64 (2d Cir. 2022) (citing *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976)) (footnote omitted). The Second Circuit has made clear that "prosecutors enjoy 'absolute immunity from § 1983 liability for those prosecutorial activities intimately associated with the judicial phase of the criminal process.'" *Id.* at 864 (quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987)) (footnote omitted). "For example, a prosecutor enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial." *Id.* (citations omitted); *see also Imbler*, 424 U.S. at 431 (concluding that a prosecutor is absolutely immune from a § 1983 suit for damages based on his "initiating a prosecution and . . . presenting the State's case"). As such, the Second Circuit has held that "absolute immunity extends even to a prosecutor who 'conspir[es] to present false evidence at a criminal trial. The fact that such a conspiracy is certainly not something that is properly within the role of a prosecutor is immaterial, because the immunity attaches to his function, not to the manner in which he performed it." *Anilao*, 27 F.4th at 864 (quotation and emphasis omitted).

Therefore, "'absolute immunity must be denied' only where there is both the absence of all authority (because, for example, no statute authorizes the prosecutor's conduct) and the absence of any doubt that the challenged action falls well outside the scope of prosecutorial authority." *Id.* (quoting *Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004)). In most cases "the laws

consideration of these submissions would not alter the Court's decision with respect to this motion'") (quotation omitted).

do authorize prosecution for the charged crimes," *Bernard*, 356 F.3d at 504, and if the charging decision or other act is within the prosecutor's jurisdiction as a judicial officer, then absolute immunity attaches to their actions "regardless of any allegations" that their "actions were undertaken with an improper state of mind or improper motive." *Shmueli*, 424 F.3d at 237. Ultimately, "unless a prosecutor proceeds in the clear absence of all jurisdiction, absolute immunity exists for those prosecutorial activities intimately associated with the judicial phase of the criminal process." *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987). "Conversely, where a prosecutor acts without any colorable claim of authority, he loses the absolute immunity he would otherwise enjoy." *Id.*

Post-arraignment, pre-trial "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). In contrast, pre-arraignment actions—such as interviewing a witness to obtain probable cause for an arrest—are not entitled to the protections of absolute immunity. *See Hill v. City of New York*, 45 F.3d 653, 658, 661 (2d Cir. 1995) ("Before any formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his acts") (citation omitted). Additionally, "absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (quoting *Imbler*, 424 U.S. at 431 n.33). Investigative tasks beyond the scope of absolute immunity are those "normally performed by a detective or police officer." *Buckley*, 509 U.S. at 273; *see also Kanciper v. Lato*, 989 F. Supp. 2d 216, 228-29 (E.D.N.Y. 2013) ("Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not

16

prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate'") (quoting *Day v. Morgenthau*, 909 F.2d 75, 77-78 (2d Cir. 1990)).

Here, the acts alleged in the complaint occurred at different procedural points: before Plaintiff's arrest and arraignment, during the grand jury presentation, at trial, and post-trial. *See* Dkt. No. 1 at ¶¶ 136-88. Defendant ADA Mancini's acts undertaken during the judicial phase, including during her presentation to the grand jury, at trial, and post-trial are undoubtably entitled to absolute immunity. *See Anilao*, 27 F.4th at 863-64. This is true even if Defendant ADA Mancini knowingly presented false evidence during the time she was operating in her function as an advocate. *See id.* at 864.

However, viewed in the light most favorable to Plaintiff, absolute immunity does not attach the Defendant ADA Mancini's pre-indictment investigative activity because it occurred before there was probable cause to arrest Plaintiff. *See* Dkt. No. 1 at ¶¶ 138-58. "It is worth recognizing that in the ordinary case it would be impossible to satisfy the 'initiation' element of a malicious prosecution claim against [a] prosecutor [defendant]." *Harris v. Tioga Cnty.*, 663 F. Supp. 3d 212, 241 (N.D.N.Y. 2023), *appeal dismissed*, No. 23-503, 2024 WL 4179651 (2d Cir. Sept. 13, 2024). Indeed, "a prosecutor unquestionably acts as an advocate—and therefore receives absolute immunity—when she initiates and pursues a criminal prosecution." *D'Alessandro v. City of New York.*, 713 Fed. Appx. 1, 5 (2d Cir. 2017). "However, courts have also held that the 'initiation' element of a malicious prosecution claim may be satisfied if a defendant fabricates evidence that is material to the probable cause determination." *Harris*, 663 F. Supp. 3d at 241 (citing *McDaniel v. City of New York.*, 585 F. Supp. 3d 503, 516-17 (S.D.N.Y. 2022)). As such, obtaining false witness statements for the purpose of obtaining probable cause can, in certain circumstances, be sufficient to sustain a claim for malicious prosecution. *See e.g.*,

*Milstein v. Cooley*, 257 F.3d 1004, 1010-11 (9th Cir. 2001) (rejecting immunity defense where prosecutor allegedly fabricated evidence material to probable cause before empaneling a grand jury).

As pled, Defendant ADA Mancini's pre-indictment interviews were conducted before probable cause to arrest existed. *See* Dkt. No. 1 at ¶¶ 137-38.  "In the Second Circuit, '[i]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity.'" *Simuro v. Shedd*, 176 F. Supp. 3d 358, 377 (D. Vt. 2016) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)).  "As many courts have recognized, police officers must exercise extreme caution in crediting the statements of young children." *Id.* at 378 (collecting cases).  "In fact, as the Sixth Circuit [has] acknowledged, 'it appears that no federal court of appeals has ever found probable cause based on a child's allegations absent some other evidence to corroborate the child's story.'" *Id.* (quoting *Wesley v. Campbell*, 779 F.3d 421, 430 (6th Cir. 2015)).  Given the inconsistent statements made by the sisters, which could plausibly raise doubt as to Scarlett and Stella's veracity, Plaintiff has plausibly alleged a lack of probable cause during Defendant ADA Mancini's pre-indictment conduct.

Although the County Defendants contend that Defendant ADA Mancini's alleged investigatory activity should be construed as mere preparation for the grand jury—which would be covered by absolute immunity—the Supreme Court has explicitly stated that "[a] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial . . . ." *Buckley*, 509 U.S. at 276; *see Kent v. Cardone*, 404 Fed.

Appx. 540, 541-42 (2d Cir. 2011) ("Although the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom, absolute prosecutorial immunity is afforded only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct") (quotations and internal quotation marks omitted).

Therefore, Defendant ADA Mancini is immune from liability only to the extent Plaintiff's claims are based on her conduct during the judicial phase of the proceeding, such as in front of the grand jury or at trial.[2] On the other hand, although the Court remains cognizant that the issue of absolute immunity should be resolved at the earliest possible stage of litigation, given the allegations of investigative misconduct in the complaint, the Court declines to rule as matter of law, at this stage, that the County Defendants are absolutely immune from liability for their conduct investigating Plaintiff. *See Hill*, 45 F.3d at 663 ("[W]hen it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss"). The County Defendants' motion is denied in part, without prejudice to renewal at a later stage, as to absolute immunity.

### 2. Qualified Immunity

As discussed, to the extent Defendant ADA Mancini's actions are not entitled to absolute immunity, the County Defendants invoke qualified immunity with regard to any investigative activity.

---

[2] The transcript of a portion of Defendant ADA Mancini's direct examination of Scarlett at Plaintiff's criminal trial, *see* Dkt. No. 26 at 64-66, of which the Court has taken judicial notice, would fall within the category of conduct that receives absolute immunity.

"If absolute immunity does not apply, government actors may be shielded from liability for civil damages by qualified immunity[.]" *Kanciper*, 989 F. Supp. 2d at 231. Similar to absolute immunity, qualified immunity is not merely a defense but rather is also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *see McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) ("This doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties'") (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)). Accordingly, the availability of qualified immunity should be decided by a court "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citations omitted).

Nonetheless, "[a] defendant asserting a qualified immunity defense at the 12(b)(6) stage . . . . faces a formidable hurdle." *McCray v. City of New York*, No. 03-CV-10080, 2007 WL 4352748, *18 (S.D.N.Y. Dec. 11, 2007) (quoting *McNamara v. City of New York*, No. 05-CV-6025, 2007 WL 1062564, *9 (E.D.N.Y. Mar. 30, 2007)) (internal citations and quotation marks omitted). "Because the evidence supporting a finding of qualified immunity is normally adduced during the discovery process and at trial, the defense of qualified immunity [usually] cannot support the grant of a Fed. R. Civ. P. 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Id.* (citation omitted).

The doctrine of "[q]ualified immunity protects government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). To defeat qualified immunity a plaintiff must show that (1) the official violated a statutory or constitutional right (2)

that was "clearly established" at the time of the challenged conduct. *Francis v. Fiacco*, 942 F.3d

126, 139 (2d Cir. 2019). The Second Circuit has, at times, broken the qualified immunity analysis

into "three discrete inquiries: (1) whether the plaintiff has established that the defendant violated a

constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if that right

was 'clearly established,' whether it was still 'objectively reasonable' for the officer to believe his

conduct was lawful." *Harris*, 663 F. Supp. 3d at 246 (quoting *Gonzalez v. Schenectady*, 728 F.3d

149, 154 (2d Cir. 2013)). "Although qualified immunity typically is asserted by police officers,

the qualified immunity standard of arguable probable cause also applies to prosecutors." *Anilao

v. Spota*, 774 F. Supp. 2d 457, 491 (E.D.N.Y. 2011), *aff'd*, 27 F.4th 855 (2d Cir. 2022) (citations

omitted).

Here, the complaint alleges that Defendant ADA Mancini knew, or recklessly disregarded

the likelihood, that Stella and Scarlett's allegations were false in light of the inconsistencies in

their statements and the delay in their disclosure of Plaintiff's alleged abuse. *See* Dkt. No. 1 at ¶¶

137, 143-48. Additionally, Plaintiff alleges that Defendant ADA Mancini avoided interviewing

B.N. and B.P., two other dance students that Scarlett alleged Plaintiff had abused, "because she

knew that Scarlett's claims were false and did not want to compromise the case by developing

evidence that would have cast doubt on Scarlett's accusations." *Id.* at ¶¶ 154-55. As Plaintiff

explains in her opposition papers, the constitutional rights at stake are "clearly established." *See,

e.g.*, *Kinzer v. Jackson*, 316 F.3d 139, 143-44 (2d Cir. 2003) ("Freedom from malicious

prosecution is a constitutional right that has long been clearly established"); *see Zahrey v. Coffey*,

221 F.3d 342, 356 (2d Cir. 2000) ("Any prosecutor aware of these cases would understand that

fabricating evidence in his investigative role violates the standards of due process and that a

resulting loss of liberty is a denial of a constitutional right").

Although, again, the Court recognizes that qualified immunity should be determined at the earliest juncture possible, there is not enough information at this early stage to determine whether the County Defendants are entitled to qualified immunity.  *See Anilao*, 774 F. Supp. 2d at 492 ("[T]here is simply insufficient information at this early stage to determine whether the conduct of the County defendants is protected by qualified immunity").  "[T]he fact-intensive question of what the defendants knew or reasonably believed, or indeed whether there is any material dispute about that question, can only be addressed on a fuller factual record, at summary judgment or trial."  *Hickey v. City of New York*, No. 01-CV-6506, 2002 WL 1974058, *5 (S.D.N.Y. Aug. 26, 2002); *see Zahrey*, 221 F.3d at 356-57 (finding court could not grant the defendant prosecutor qualified immunity as a matter of law on a motion to dismiss where the plaintiff put forth sufficient allegations that he was deprived of liberty as a result of the prosecutor's fabrication of evidence during the investigation); *Bostic v. City of Binghamton*, No. 3:06-CV-540, 2006 WL 2927145, *4 (N.D.N.Y. Oct. 11, 2006) ("While the facts that may be established through discovery might lead to the conclusion that the individual defendants possessed actual or arguable probable cause to arrest [the p]laintiff and commence his prosecution . . . that determination will have to await a summary judgment motion or trial").

Accordingly, the Court finds that the County Defendants' motion for dismissal on the basis of qualified immunity must be denied as premature, without prejudice to renewal at a later stage.

## D.    Malicious Prosecution

To state a claim for malicious prosecution, the plaintiff must plausibly allege, "'(1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions.'"  *Jocks v. Tavernier*, 316 F.3d 128,

136 (2d Cir. 2003) (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).

"[A] defendant could have initiated a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.'" *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 605 (quoting *Costello v. Milano*, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014)).  The Second Circuit has held that although "police officers do not generally 'commence or continue' criminal proceedings against defendants, a claim for malicious prosecution can still be maintained against a police officer if the officer is found to 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015) (quotation omitted).  "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Id.* (citation omitted); *see Joyner v. Cnty. of Cayuga*, No. 5:20-CV-60, 2020 WL 1904088, *8 (N.D.N.Y. Apr. 17, 2020).  "[I]n the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment," a claim of malicious prosecution against the officer must fail.  *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) (citations omitted).

The Village Defendants deny that Officer Sackett initiated or continued a criminal proceeding.  *See* Dkt. No. 17-1 at 12-15.  The complaint alleges that Defendant Sackett failed to follow well-established public protocol, thereby creating evidence that he knew was false. Specifically, Defendant Sackett is alleged to have, *inter alia*, requested that New York State Police conduct an interview of Stella, discussed the ongoing investigation with the Tioga County Chief Assistant District Attorney, reviewed Stella's recorded interview and made a report that he found Stella's testimony to corroborate Scarlett's written statements despite material

inconsistencies,[3] took photographs during a walk though inside the building where Studio J was located, failed to investigate possible reasons for the sisters' inconsistent statements or why Plaintiff's alleged abuse had never been disclosed despite ample prior opportunities to do so, and, after taking the photographs at Studio J's former location, "forwarded the case file to [Defendant] ADA Mancini." *See* Dkt. No. 1 at ¶¶ 110-14, 125-36. As such, Plaintiff has plausibly alleged that Defendant Sackett created and forwarded false information to prosecutors, thereby initiating or continuing a prosecution.

The Village Defendants also contend that the chain of causation for malicious prosecution was broken when the case was passed to the prosecuting attorney or grand jury. *See* Dkt. No. 17-1 at 14-15. Although some courts have used the phrase "chain of causation," often the discussion of breaking the chain of causation is a reiterated version of a discussion of whether there is malice or bad faith alleged to meet the elements of a malicious prosecution claim, rather than an additional argument. For example,

> when a plaintiff pursues a claim of malicious prosecution against police officers based on an "unlawful arrest," the "intervening exercise of independent judgment" by a prosecutor to pursue the case usually breaks the "chain of causation" unless the plaintiff can produce evidence that the prosecutor was "misled or pressured" by the police.

*Dufort v. City of New York*, 874 F.3d 338, 352 (2d Cir. 2017) (citation omitted); *see also Hasan v. Onondaga Cnty.*, No. 5:18-CV-806, 2021 WL 5868121, *14 (N.D.N.Y. Dec. 10, 2021) ("When a plaintiff pursues a claim of malicious prosecution against police officers based on an unlawful arrest, the 'intervening exercise of independent judgment' by a prosecutor usually breaks the 'chain

---

[3] The Court highlights that Plaintiff alleges Defendant Sackett's report, which he forwarded to prosecutors, was "materially false both because it contained affirmative false statements and

of causation' unless the plaintiff can show the prosecutor was 'misled or pressured' by an officer")
(citation omitted); *Buari v. City of New York*, 530 F. Supp. 3d 356, 386 (S.D.N.Y. 2021) (holding
that the defendants "cannot avoid liability by pointing a finger at the [state court] that [they]
allegedly deceived and misled") (citation omitted); *Jorgensen v. Cnty. of Suffolk*, 558 F. Supp. 3d
51, 63 (E.D.N.Y. 2021) (utilizing "chain of causation" language in discussing malicious
prosecution claim).

Here, Plaintiff alleges that Defendant Sackett forwarded his report, State Police and DSS
reports, and Stella's videotaped statement to the Tioga County District Attorney's Office. *See*
Dkt. No. 1 at ¶¶ 126-28, 135-36. These reports reflected Scarlett and Stella's delayed,
contradictory claims of abuse, which Plaintiff claims Defendant Sackett knew or should have
known were false. *See id.* Additionally, Defendant Sackett's own report included the allegedly
materially false statement that Stella's interview corroborated Scarlett's claims of abuse. *See id.* at
¶¶ 126-28. Taking Plaintiff's allegations as true, it is plausible that Defendant Sackett misled
prosecutors and, thus, the chain of causation is not broken by passing on such allegedly improper
evidence. Therefore, the Village Defendants are not entitled to dismissal based on intervening
causation.

The Village and County Defendants also argue that the malicious prosecution claims must
be dismissed because there was probable cause and because Defendants' actions were not
motivated by actual malice. *See* Dkt. No. 17-1 at 15-24; Dkt. No. 20-1 at 15-17.

"Because lack of probable cause is an element of a malicious prosecution claim, 'the
existence of probable cause is a complete defense to a claim of malicious prosecution.'"

---

omitted material facts, and he knew, or should have known, that the report was materially false."
Dkt. No. 1 at ¶ 128.

*Stansbury v. Wertman*, 721 F.3d 84, 94-95 (2d Cir. 2013) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010)).  "Probable cause, in the context of malicious prosecution, has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty."  *Adams v. City of New York*, 226 F. Supp. 3d 261, 269 (S.D.N.Y. 2016) (citation omitted).  "[I]ndictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"  *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (emphasis in original) (quotation omitted).  "Alternatively, the presumption 'can be overcome by a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.'"  *Hill v. Melvin*, No. 05-CV-6645, 2006 WL 1749520, *13 (S.D.N.Y. June 27, 2006) (quotation omitted).

Additionally, "'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'"  *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)).  "Although information furnished to police by a person who claims to be a victim of a crime generally 'suffices to establish probable cause,' this presumption of victim reliability only survives in the 'absence of circumstances that raise doubts as to the victim's veracity[.]'"  *Sankar v. City of New York*, 867 F. Supp. 2d 297, 306 (E.D.N.Y. 2012) (quoting *Oliveira v. Mayer*, 23 F.3d 642, 647 (2d Cir. 1994); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)) (internal citations omitted) (cleaned up).  "Prior relationships, . . . which 'give[ ] rise to a motive for a false accusation' are '[t]he most common situation in which . . . doubts arise' as to the veracity of the complaining witness."  *Id.* (quoting *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y.

26

1998)) (footnote omitted). As such, although an arresting officer generally "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (citation omitted), "where, . . . a bitter prior relationship exists 'and *is known to the arresting officer before the arrest is made*, the complaint alone may not constitute probable cause; the officer may need to investigate further,'" *Sankar*, 867 F. Supp. 2d at 306 (quoting *Mistretta*, 5 F. Supp. 2d at 133) (emphasis in original).

In deciding a motion to dismiss, the court does not consider affirmative defenses that require the court to weigh evidence. *See Shabazz v. Kailer*, 201 F. Supp. 3d 386, 393 (S.D.N.Y. 2016) ("Where the question of whether an arresting officer had probable cause is predominantly factual in nature . . . the existence . . . of probable cause is to be decided by the jury") (citation omitted). The court may, however, consider affirmative defenses that are clear from the face of the complaint. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).

Drawing all reasonable inferences in Plaintiff's favor, as the Court must, Plaintiff has stated malicious prosecution claims. Plaintiff alleges that Defendants commenced and continued the proceeding without probable cause, *see* Dkt. No. 1 at ¶ 4, as Defendants Sackett and ADA Mancini knew the evidence was not reliable or was affirmatively false, failed to observe typical guidelines for these types of investigations and prosecutions, and failed to conduct further investigation, *id.* at ¶¶ 34, 124-58. According to the complaint, Scarlett and Stella's accusations against Plaintiff suspiciously transformed over the course of several years: in 2011 the sisters both told investigators that Plaintiff never abused them, then by 2013 Stella began to claim that Plaintiff abused her but that the abuse happened at her home in Binghamton, then, after the Broome County District Attorney informed Jason and Kristy Haase that Plaintiff would not be prosecuted in Broome County, Scarlett made her first accusation that Plaintiff had abused her at

Studio J in Tioga County, and shortly thereafter, Stella came forward with accusations of abuse that occurred in Tioga County.  *See* Dkt. No. 1 at ¶¶ 54-55, 71-81, 94-104, 116-24.

Not only did the sisters' allegations of abuse in Tioga County contradict one another, Scarlett and Stella allegedly suffer from a disability that can impact memory and suggestibility, and the accusations were made amidst a deeply contentious family fallout that included custody disputes, alleged parental alienation, and Jason Haase's criminal conviction for sexually assaulting the sisters' mother in front of them.  *See id.* at ¶¶ 35-55, 62.  Defendants Sackett and ADA Mancini's alleged failure to make further inquiry in light of these issues and their failure to investigate the claims in a manner consistent with widely accepted practices is enough, at this stage, to overcome the presumption of probable cause that arises from the grand jury indictment. [4]

The Court also rejects Defendants' arguments that Plaintiff's conviction, which was initially upheld by the Third Department, established probable cause.  *See* Dkt. No. 17-1 at 18-21; Dkt. No. 20-1 at 17.  "If, following the arrest, the plaintiff was convicted of the charges against him, that conviction normally 'would be conclusive evidence of probable cause.'"  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Broughton v. State*, 37 N.Y.2d 451, 458 (1975)). However, "[a] conviction that has been reversed on appeal is no evidence of the existence of probable cause; to the contrary, 'evidence of a subsequent dismissal, acquittal or reversal on appeal would . . . be admissible to refute . . . justification." *Id.* (quotation omitted).  As alleged in the complaint, in 2022, the Third Department reversed the Tioga County Court's denial of Plaintiff's motion for a new trial based on newly discovered evidence and ineffective assistance of

---

[4]  This conclusion also dispenses with Defendants' arguments related to the malice element, as a lack of probable cause can satisfy this element of a malicious prosecution claim.  *See Noga v. City of Schenectady Police Officers*, 169 F. Supp. 2d 83, 90 (N.D.N.Y. 2001) ("'[M]alice may be inferred from lack of probable cause'") (quoting *Lowth*, 82 F.3d at 573).

counsel, after Plaintiff obtained five signed witness statements attesting to Stella's admission that she and Scarlett lied about Plaintiff's abuse. *See* Dkt. No. 1 at ¶¶ 197-202. Thereafter, the trial court granted Plaintiff's motion to set aside the verdict and granted her a new trial. *See id.* at ¶ 205. Even if a nullified conviction and dismissal of charges did create a presumption of probable cause (a strained legal conclusion that would require Olympian feats of flexibility to reach), Defendants concede that such a presumption would be rebuttable. *See* Dkt. No. 17-1 at 18. As discussed, Plaintiff's allegations are sufficient to rebut a presumption that there was probable cause for her prosecution. [5]

Accordingly, Defendants' motions to dismiss are denied as to the malicious prosecution claims.[6]

## E.    Right to Fair Trial

A "'claim for the denial of the right to a fair trial can proceed under [§] 1983 based on allegations that a police officer fabricated evidence, if that fabrication caused a deprivation of the plaintiff's liberty . . . .'" *Bailey v. City of New York*, 79 F. Supp. 3d 424, 446 (E.D.N.Y. 2015) (quoting *Morse v. Spitzer*, No. 07-CV-4793, 2012 WL 3202963, *5-6 (E.D.N.Y. Aug. 3, 2012)). An officer deprives, "[a] person . . . of her constitutional right to a fair trial when 'an (1)

---

[5]  Similarly, the Village Defendants' bald assertion, without citation to legal authority, that the Third Department's findings "collaterally estop" Plaintiff's malicious prosecution claim is devoid of merit. *See* Dkt. No. 17-1 at 15. The Village Defendants do not contest that Plaintiff's prosecution ended in a favorable termination, thus, the collateral attack considerations contemplated by the Supreme Court in *Heck v. Humphrey*, 512 U.S. 477 (1994) are inapplicable to an analysis of the present motions.

[6]  To the extent that Defendants argue that negligence or reckless disregard is not enough to state a malicious prosecution claim, *see* Dkt. No. 17-1 at 10-12; Dkt. No. 20-1 at 16, the Court need not reach that question as Plaintiff alleges the Defendants "knew" the evidence was false. Additionally, to the extent the County Defendants argue that a claim for wrongful detention/ incarceration is untimely, *see* Dkt. No. 20-1 at 13, Plaintiff does not bring such a claim and, thus,

investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result.'" *Folk v. City of New York*, 243 F. Supp. 3d 363, 374 (E.D.N.Y. 2017) (quoting *Jovanovic v. City of New York*, 486 Fed. Appx. 149, 152 (2d Cir. 2012)).  The officer must have "knowingly falsif[ied] evidence." *Smalls v. Collins*, 10 F.4th 117, 132 (2d Cir. 2021), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36, 49 (2022) (citation omitted); *see Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, *16 (S.D.N.Y. Sept. 29, 2018) ("Conclusory statements that officers fabricated evidence do not suffice to state a claim for the denial of a fair trial . . . .  Instead[,] plaintiffs must identify the actual fabrication") (citations omitted).

A prosecutor performing investigative functions may also be held liable for denial of a right to a fair trial, where the prosecutor knowingly fabricated evidence.  *See Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015) (affirming verdict against prosecutor on deprivation of right to fair trial claim where prosecutor knowingly falsified evidence as part of investigation and used such evidence to indict the plaintiff).

Here, Plaintiff alleges that Defendants Sackett and ADA Mancini "created, or participated in creating, the false evidence that resulted in [Plaintiff's] conviction, and they both ignored established practices for conducting investigations into allegations of child sex abuse that were accepted and well-known in the law enforcement community by 2014."  Dkt. No. 1 at ¶ 6. Plaintiff has alleged facts that the Defendants purposely created false evidence via improper interview techniques, or that they recklessly disregarded the fact that the evidence being forwarded and presented was false.

The Court rejects the Village Defendants' argument that Plaintiff failed to allege with

---

the Court does not reach the issue.

specificity what evidence Defendant Sackett created or falsified. Plaintiff has specifically alleged that Defendant Sackett, *inter alia*, knowingly created a report that was materially false because it stated that Stella's testimony corroborated Scarlett's written statement, despite inconsistencies that would have prompted a reasonable officer to conduct further investigation, and committed "a gross departure from accepted practices" in conducting his investigation, leading to the creation of fabricated evidence. *See id.* at ¶¶ 126-28, 135.

Further, "'[§] 1983 liability attaches for knowingly falsifying evidence even where there simultaneously exists a lawful basis for [the] deprivation of liberty.'" *Smalls*, 10 F.4th at 132 (quoting *Victory v. Pataki*, 814 F.3d 47, 64 (2d Cir. 2016)). Here, the Village Defendants argue that the State courts found the evidence presented at trial credible. *See* Dkt. No. 17-1 at 25. However, even if there was probable cause or the information was believable, "a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process'." *Ricciuti*, 124 F.3d at 130 (quotation omitted). Thus, regardless of whether the State courts believed the evidence, an officer's knowing falsification of evidence is still actionable. As such, the motion to dismiss the fair trial deprivation claims against the Village Defendants is denied.

As for Defendant ADA Mancini, the County Defendants argue that, in the absence of absolute immunity, Plaintiff's fair trial claim fails because the complaint does not allege that Defendant ADA Mancini fabricated evidence. *See* Dkt. No. 20-1 at 18-19. Although malicious prosecution and denial of the right to a fair trial claims are generally considered distinct constitutional claims, in cases where a government official is alleged to have fabricated evidence in order to create probable cause for an arrest or prosecution, "the question of whether the defendant fabricated evidence becomes synonymous with the question of whether genuine

probable cause existed, and accordingly a plaintiff's malicious prosecution and fair trial claims

would rise or fall together." *Spitzer*, 2012 WL 3202963, at *6.

Defendant ADA Mancini is undoubtably immune from suit for actions taken during the

judicial phase of the proceeding, but as discussed, Plaintiff has alleged that Defendant ADA

Mancini participated in the creation of fabricated evidence for the purpose of obtaining probable

cause to arrest during the pre-indictment investigatory phase of the case.  *See* Dkt. No. 1 at ¶¶

137-38.  Indeed, "a prosecutor is immune from liability for out-of-court efforts to control a

witness' grand jury testimony that are made subsequent to the decision to indict . . . [,] [b]ut such

immunity does not protect efforts to manufacture evidence that occur during the investigatory

phase of a criminal case."  *Hill*, 45 F.3d at 662 (internal citations omitted).  Plaintiff plausibly

alleges denial of a fair trial by fabrication of evidence.  *See Zahrey*, 221 F.3d at 356 ("Though it

may be a rare claim that the official who fabricated evidence in an investigatory role is the same

person who later presented it to a grand jury in an advocacy role, the unusual facts of Zahrey's

claim do not remove it from the broader category of claims that have long been recognized as

alleging violations of clearly established constitutional rights").

Accordingly, the County Defendants' motion is denied as to the deprivation of fair trial

claim.

**F.    Failure to Intervene**

An officer may be liable for failure to intervene under § 1983 "where '(1) the officer had a

realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's

position would know that the victim's constitutional rights were being violated; and (3) the officer

does not take reasonable steps to intervene.'"  *Gerasimou v. Cillis*, No. 15-CV-6892, 2022 WL

118748, *5 (E.D.N.Y. Jan. 12, 2022) (quoting *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008), *aff'd*, 461 Fed. Appx. 18 (2d Cir. 2012)).

The Village Defendants argue that the failure to intervene claim against Defendant Sackett must be dismissed because there was no underlying constitutional violation. *See* Dkt. No. 17-1 at 26. As the Court has found Plaintiff adequately alleged malicious prosecution and deprivation of fair trial claims against Defendant Sackett, Plaintiff has claimed a primary constitutional violation at this juncture, and the Village Defendants' motion is denied on these grounds.

## G.    Failure to Train

Plaintiff brings failure to train claims against Defendants the County and the Village pursuant to § 1983. *See* Dkt. No. 1 at ¶¶ 239-50.

It is well settled that "'[a] municipality cannot be made liable [under § 1983] by application of the doctrine of *respondeat superior*.'" *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quotation omitted). Rather, "[i]n order to hold [a municipality] liable under § 1983, [a] plaintiff must put forth sufficient evidence to show that [the] individual defendants' unconstitutional actions were taken pursuant to an official municipal policy, custom, or practice." *Thornton v. Cnty. of Albany*, No. 9:14-CV-679, 2016 WL 5793714, *7 (N.D.N.Y. Oct. 4, 2016) (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-91 (1970)). As a result, to demonstrate *Monell* liability, a plaintiff must allege a violation of constitutional rights by employees of the municipality and "(1) 'the existence of a municipal policy or custom . . . that caused his injuries beyond merely employing the misbehaving officer[s]'; and (2) 'a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights.'" *Harper v. City of New York*, 424 Fed. Appx. 36, 38 (2d Cir. 2011) (quoting *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)) (internal quotation marks omitted).

> A plaintiff may plead a municipal policy or custom by alleging: (1)
> a formal policy, promulgated or adopted by the entity; or, (2) that
> an official with policymaking authority took action or made a
> specific decision which caused the alleged violation of
> constitutional rights; or (3) the existence of an unlawful practice by
> subordinate officials that was so permanent or well settled so as to
> constitute a "custom or usage," and that the practice was so
> widespread as to imply the constructive acquiescence of
> policymaking officials.

*Shepherd v. Powers*, No. 11-CV-6860, 2012 WL 4477241, *9 (S.D.N.Y. Sept. 27, 2012)

(quotation omitted).

Generally, "a single incident alleged in a complaint, especially if it involved only actors

below the policy-making level, does not suffice to show a municipal policy[,]" *Ricciuti*, 941 F.2d

at 123, unless "'there is an officially promulgated policy as that term is generally understood,' [or]

'where a single act is taken by a municipal employee who, as a matter of [s]tate law, has final

policymaking authority in the area in which the action was taken,'" *Deraffele v. City of New

Rochelle*, No. 15-CV-282, 2016 WL 1274590, *16 (S.D.N.Y. Mar. 30, 2016) (quoting *Newton v.

City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008)).  "A pattern of similar

constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate

indifference for purposes of failure to train[,]" because "[w]ithout notice that a course of training

is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a

training program that will cause violations of constitutional rights."  *Connick v. Thompson*, 563

U.S. 51, 61 (2011) (quotation and internal quotation marks omitted).

To state a claim for municipal liability under § 1983, "a plaintiff must allege facts tending

to support, at least circumstantially, an inference that such a municipal policy or custom exists."

*Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citation omitted).  The

Second Circuit has "been consistent in holding that the actions of county prosecutors in New York

are generally controlled by municipal policymakers for purposes of *Monell*, with a narrow

exception emanating from *Baez* being the decision of whether, and on what charges, to

prosecute." *Bellamy v. City of New York*, 914 F.3d 727, 759 (2d Cir. 2019). "[A] district attorney

may be deemed to have acted as a county policymaker when he acts as the manager of the district

attorney's office . . . [but not for] misconduct in prosecuting an individual." *McKeon v. Daley*,

101 F. Supp. 2d 79, 92 (N.D.N.Y. 2000) (citations omitted).

"The Supreme Court has emphasized that '[a] municipality's culpability for a deprivation

of rights [under § 1983] is at its most tenuous where a claim turns on a failure to train.'"

*D'Alessandro*, 713 Fed. Appx. at 10 (quoting *Connick*, 563 U.S. at 61). Under § 1983, a

municipality's failure to train its employees in a relevant respect must amount to "'deliberate

indifference to the rights of persons with whom the [untrained employees] come into contact.'"

*Connick*, 563 U.S. at 61 (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)). A pattern of

similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate

deliberate indifference for purposes of failure to train. *See id.* at 62 (citation omitted). However,

"the unconstitutional consequences of failing to train could be so patently obvious that a city

could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64

(discussing "single-incident" liability as articulated in *Canton*).

Plaintiff alleges that the County's failure to train prosecutors and investigators in

"generally accepted practices for investigating allegations of child sexual abuse" subjects the

municipality to *Monell* liability. *See* Dkt. No. 1 at ¶ 240. As to prosecutors, the Supreme Court

has explained that because of lawyers' ethical and continuing educational responsibilities,

"recurring constitutional violations are not the 'obvious consequence' of failing to provide

prosecutors with formal in-house training about how to obey the law." *Connick*, 563 U.S. at 66

35

(citation omitted). Further, the Court holds that "[a] district attorney is entitled to rely on prosecutors' professional training and ethical obligations in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations in "the usual and recurring situations with which [the prosecutors] must deal." *Id.* at 67 (quoting *Canton*, 489 U.S. at 391) (footnote omitted).

In this District, failure to train claims have been dismissed where the "[p]laintiff's complaint does not sufficiently allege a pattern of similar constitutional violations by the District Attorney's Office." *Washington v. Broome Cnty. Dist. Attorney's Off.*, No. 3:20-CV-1099, 2020 WL 9455048, *4 (N.D.N.Y. Nov. 24, 2020), *report and recommendation adopted*, 2021 WL 1660480 (N.D.N.Y. Apr. 28, 2021). Indeed, although, "'in a narrow range of circumstances,'" a plaintiff can establish a "failure to train" claim based on a single incident, *Connick*, 563 U.S. at 63 (quotation omitted), "because prosecutors are subject to a rigorous 'regime of legal training and professional responsibility,' a municipality cannot be said to be on notice of a recurrent problem in a district attorney's office simply because a prosecutor erred in one case." *D'Alessandro*, 713 Fed. Appx. at 11 (quoting *Connick*, 563 U.S. at 66-67).

Here, Plaintiff only complains specifically about the prosecutorial acts relevant to her case, and not as part of a larger group of instances of such constitutional violations. Moreover, although Plaintiff mentions the County's failure to train unnamed investigators, Plaintiff fails to allege that inadequate training of these unnamed individuals led to recurring constitutional violations. Although Plaintiff asserts that "the elected District Attorney of Tioga County exhibited deliberate indifference to the rights of persons *such as* [P]laintiff," Dkt. No. 1 at ¶ 243, such conclusory allegations are insufficient to plausibly allege a pattern of similar constitutional violations necessary to establish *Monell* liability. As such, the claim against the County for

failing to train its prosecutors and/or investigators based on the single underlying incident is dismissed.

In the same vein, the Village argues that Plaintiff has failed to allege a pattern of other similar constitutional injuries that resulted from an alleged policy or custom of indifference to training by the Village. *See* Dkt. No. 17-1 at 26-28. "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388. As the Supreme Court articulated:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390.

Plaintiff alleges the Village failed to train its police officers and investigators in generally accepted practices for handling child sexual abuse cases. *See* Dkt. No. 1 at ¶ 246. And, in opposition to the Village Defendants' motion, Plaintiff argues the Village was on notice of the risk of failing to train officers on publicly available and developed standards for the investigation of child sex abuse allegations. *See* Dkt. No. 25 at 28-31.

Plaintiff relies on a three-factor test articulated in *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992), but the complaint lacks factual allegations that are sufficient to satisfy this standard. After reciting a list of investigative steps that Plaintiff insists the Village should have trained its officers to take, Plaintiff merely posits the conclusory allegations that "[t]he need

for the foregoing training was obvious given the knowledge that the law enforcement community

has acquired by[] 2014 when the investigation took place." Dkt. No. 1 at ¶ 248.  To put it

succinctly, Plaintiff has alleged nothing more than the single incident at issue to support an

inference that the Village failed to train its investigators—this is not enough to plead deliberate

indifference.  *See Baumeister v. Erie Cnty.*, No. 23-CV-1150, 2024 WL 4362311, *8 (W.D.N.Y.

Sept. 30, 2024) ("[The plaintiff] provides no factual support for his failure to train allegations

other than the single incident here, which is insufficient to support a *Monell* claim") (citing

*Bradley v. City of New York*, 2009 WL 1703237, at *2 (E.D.N.Y. June 18, 2009) (explaining that

"[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under

*Monell,* unless proof of the incident includes proof that it was caused by an existing,

unconstitutional municipal policy, which can be attributed to a municipal policymaker")

(alteration in original) (quotation omitted)).

Plaintiff also points to this Court's decision in *Werkheiser v. County of Broome*, 655 F.

Supp. 3d 88 (N.D.N.Y. 2023), asserting that a motion to dismiss a failure to train claim was

denied "where plaintiff alleged that municipal defendant 'would know of the risk of failing to train

officers because of publicly available and accepted materials about how to investigate such

cases.'" Dkt. No. 25 at 30 (quotation omitted).  However, in *Werkheiser v. County of Broome*, the

Court reached this conclusion, in part, because (1) the plaintiff alleged that the City of

Binghamton had its own Children's Advocacy Center, "demonstrating its acute awareness of the

special attention or requirements of interviewing child survivors of abuse," and (2) one of the

investigators had "no training" in investigating child sex abuse cases before he conducted an

interview of one of the purported victims.  *Werkheiser v. Cnty. of Broome*, 655 F. Supp. 3d 88,

112 (N.D.N.Y. 2023).  Here, Defendant Sackett is not alleged to have interviewed Scarlett or

Stella and there are no other factual allegations that support a plausible inference that the Village failed to train its investigators with deliberate indifference. [7]

For these reasons, the Village Defendants' motion is granted as to the failure to train claim.

**H.    Punitive Damages**

The County Defendants argue that there "is no basis for punitive damages" in this matter and that Plaintiff cannot recover such damages against a municipality as a matter of law. *See* Dkt. No. 20-1 at 31.

First, as Plaintiff makes clear, punitive damages are sought only against Defendants Sackett and ADA Mancini, and not against the County. *See* Dkt. No. 29 at 31. Second, "[p]unitive damages are available in a [§] 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Ortiz v. Stambach*, 137 F.4th 48, 70 (2d Cir. 2025) (quoting *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996)) (internal quotation marks omitted). At this stage, Plaintiff has pled facts that, if proven, could establish that Defendant ADA Mancini's conduct involved "reckless or callous indifference" to Plaintiff's constitutional rights. Therefore, this aspect of County Defendants' motion is denied.

## IV. CONCLUSION

---

[7]  Although the Court has taken judicial notice of New York State legislative materials related to the codification of the crime of Predatory Sexual Assault Against a Child, *see* Dkt. No. 26 at 68-77, this evidence does not establish the Village's deliberate indifference to training. The legislative material discusses increased penalties by New York State for sexual crimes against children but mentions nothing about police training. Plaintiff selectively quotes the bill's justification clause which states, in part, that "more needs to be done." *See* Dkt. No. 25 at 29. However, this language is asserted in the context of "more" needing to be done to increase penalties imposed for the sexual assault of children to deter such conduct—a statement directed at legislators.

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Village Defendants' motion to dismiss (Dkt. No. 17) is **GRANTED in part and DENIED in part**; and the Court further

**ORDERS** that the County Defendants' motion to dismiss (Dkt. No. 20) is **GRANTED in part and DENIED in part**;[8] and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated:  September 23, 2025
       Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[8]  As a result of this Memorandum-Decision and Order, Plaintiff's failure to train claims against Defendants the County and the Village are dismissed.  The claims that remain are: (1) malicious prosecution, pursuant to § 1983, against Defendants Sackett, ADA Mancini, and John Does 1-10; (2) denial of the right to fair trial, pursuant to § 1983, against Defendants Sackett and ADA Mancini; (3) malicious prosecution under New York State law against all Defendants; and (4) failure to intervene, under State law and pursuant to § 1983, against Defendant Sackett.